# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IDT CORPORATION and HOWARD JONAS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N18C-03-032 PRW CCLD |
| U.S. SPECIALTY INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and XL SPECIALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Submitted: October 25, 2018
Decided: January 31, 2019
**Corrected: February 15, 2019**

*Upon Plaintiffs IDT Corporation and Howard Jonas'*
*Motion for Partial Summary Judgment,*
**GRANTED** in part; **DENIED** in part.

*Upon Defendant U.S. Specialty Insurance Company's*
*Cross-Motion for Summary Judgment,*
**GRANTED** in part; **DENIED** in part.

*Upon Defendant National Union Fire Insurance Company of Pittsburgh, PA's*
*Motion for Summary Judgment,*
**GRANTED** in part; **DENIED** in part.

*Upon Defendant XL Specialty Insurance Company's*
*Motion for Summary Judgment and Joinder,*
**DENIED.**

# MEMORANDUM OPINION AND ORDER

Brian M. Rostocki, Esquire, Benjamin P. Chapple, Esquire, Reed Smith LLP, Wilmington, Delaware, Robin L. Cohen, Esquire (*pro hac vice*), Keith McKenna, Esquire (*pro hac vice*) (argued), McKool Smith, P.C., New York, New York, Attorneys for Plaintiffs.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, Phillips, Goldman, McLaughlin & Hall, P.A., Wilmington, Delaware, Alexander R. Karam, Esquire (*pro hac vice*) (argued), Addison Draper, Esquire (*pro hac vice*), Clyde & Co US LLP, Washington, DC, Attorneys for Defendant U.S. Specialty Insurance Company.

Henry duPont Ridgely, Esquire, John L. Reed, Esquire (argued), Ethan H. Townsend, Esquire, DLA Piper LLP, Wilmington, Delaware, Joseph G. Finnerty III, Esquire (*pro hac vice*), Megan Shea Harwick, Esquire (*pro hac vice*), Eric S. Connuck, Esquire (*pro hac vice*), DLA Piper LLP, New York, New York, Attorneys for Defendant National Union Fire Insurance Company of Pittsburgh, PA.

Timothy Jay Houseal, Esquire, Jennifer M. Kinkus, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Charles C. Lemley, Esquire (*pro hac vice*) (argued), Wiley Rein LLP, Washington, DC, Attorneys for Defendant XL Specialty Insurance Company.

**WALLACE, J.**

## I.    INTRODUCTION

Plaintiffs IDT Corporation and Howard Jonas seek declaratory relief and damages for breach of contract against Defendant Insurers U.S. Specialty Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and XL Specialty Insurance Company, allegedly arising from those insurers' obligations to cover costs IDT and Jonas incurred in a Delaware Court of Chancery case—*In re Straight Path Communications Inc. Consolidated Stockholder Litigation*, No. 2017-0486-SG (Del. Ch.) (the "*Straight Path* Action").

Now before the Court are the parties' several requests for summary judgment. On those, the Court rules as follows:  IDT's Motion for Partial Summary Judgment on Defense Costs is **GRANTED**, in part, and **DENIED**, in part; U.S. Specialty's Cross-Motion for Summary Judgment is **GRANTED**, in part, and **DENIED**, in part; National Union's Motion for Summary Judgment is **GRANTED** with respect to National Union's coverage obligations for IDT, and **DENIED** with respect to National Union's duty to defend Jonas in the *Straight Path* Action; and XL Specialty's Motion for Summary Judgment and Joinder is **DENIED**.

## II. FACTUAL BACKGROUND

### A. THE PARTIES.

IDT is a Delaware corporation founded by Jonas in 1990 with its principal place of business in New Jersey.[1] Jonas has served as IDT's Chairman since its incorporation, served as its CEO at various times, and controls a majority of IDT's voting stock.[2] Straight Path Communications Inc. is a Delaware corporation headquartered in Virginia that owns two subsidiaries -- one holds 39 GHz and 28 GHz fixed wireless spectrum licenses (the "Spectrum Assets"); the other holds a majority stake in intellectual property related to internet communications (the "IP Assets").[3] Prior to its spin-off in 2013, Straight Path was a wholly-owned subsidiary of IDT.[4]

### B. THE *STRAIGHT PATH* ACTION.

On July 31, 2013, Straight Path was spun-off from IDT (the "Spin-Off"). One of Jonas's sons, Davidi Jonas, served as Straight Path's CEO and President at the time of the Spin-Off.[5] Under the Spin-Off's terms, Straight Path common stocks

---

[1]    Pls.' Compl. ¶ 8.

[2]    Opening Br. in Supp. of Pls.' Mot. for Partial Summ. J. on Defense Costs against Def. U.S. Specialty Ins. Co. [hereinafter "Pls.' Br."] Ex. 4 Verified Consolidated Amended Class Action and Derivative Compl. [hereinafter "*Straight Path* Compl."] ¶ 18.

[3]    *Straight Path* Compl. ¶ 16.

[4]    *Id.* ¶¶ 17, 34.

[5]    *Id.* ¶ 20.

were distributed *pro rata* to IDT stockholders, including Jonas, who maintained voting control of Straight Path through a dual-class structure.[6] In fact, the Spin-Off resulted in Jonas retaining complete voting control over both IDT and Straight Path.[7] But following the Spin-Off, Straight Path was a stand-alone company.[8]

Jonas also retained certain consent rights with respect to Straight Path after the Spin-Off, including the right to consent to any merger, consolidation, or sale of all of Straight Path's assets.[9] In addition, as part of the Spin-Off, IDT and Straight Path entered into a Separation and Distribution Agreement ("Separation Agreement") under which IDT agreed to indemnify Straight Path for any liabilities arising from or related to conduct pre-dating the Spin-Off.[10]

In November 2015, Sinclair Upton Research alleged that IDT had defrauded the Federal Communications Commission when it sought renewal of certain of its 39 GHz licenses in 2011 and 2012. Sinclair Upton alleged that Straight Path had failed to comply with the FCC's substantial service requirements because none of

---

[6]     *Id.* ¶ 36; *id.* ¶ 21 (explaining that Jonas's Straight Path stock was then held in a trust of which Jonas was the beneficiary).

[7]     *Id.* ¶ 40.

[8]     *Id.* ¶ 36.

[9]     *Id.* ¶ 39.

[10]    *Id.* ¶ 36.

the systems that IDT had purportedly constructed under those licenses were operational.[11] In 2016, the FCC commenced an investigation into Sinclair Upton's allegations and concluded that Straight Path had engaged in fraudulent practices when seeking its license renewals.

In mid-January, 2017, Straight Path and the FCC entered into a consent decree (the "Consent Decree") under which Straight Path:

- agreed to forfeit 20% of its spectrum licenses;

- was required to sell its remaining spectrum licenses to a third-party within one year of the Consent Decree and to pay 20% of the proceeds of the sale to the FCC; and

- agreed to pay a $100 million fine.

Under the Consent Decree that $100 million fine could be reduced to $15 million if Straight Path completed the required third-party sale within the one-year time frame.[12] But if Straight Path failed to sell its licenses or failed to pay the required fine, its licenses would be forfeited to the FCC.[13] The terms of the Consent Decree left Straight Path with little choice but to sell itself.[14]

---

[11]    *Id.* ¶¶ 42, 45.

[12]    *Id.* ¶¶ 42–55.

[13]    *Id.* ¶ 55.

[14]    *Id.* ¶¶ 54, 60, 63.

Soon after Straight Path entered into the Consent Decree with the FCC, Straight Path's Board of Directors formed a Special Committee to consider matters relating to the imminent sale of its remaining assets.[15] While the Board's financial advisor reached out to potential bidders, the Special Committee considered its indemnification rights under the Separation Agreement and the feasibility of asserting an indemnification claim against IDT (the "Indemnification Claim") for the financial liability incurred by Straight Path under the Consent Decree.[16] At a meeting held in February 2017, the Special Committee decided to preserve and pursue the Indemnification Claim for the benefit of Straight Path's stockholders.[17]

Later that month, the Special Committee's counsel advised Straight Path's counsel of the Special Committee's intention to preserve the Indemnification Claim and advised Straight Path's counsel that the Special Committee was exploring its alternatives with respect thereto. Those alternatives included selling only the Spectrum Assets or assigning the Indemnification Claim to a litigation trust, which, in either case, would permit Straight Path to pursue the Indemnification Claim against IDT post-closing.[18] As the sales process moved forward, the Special

---

[15]    *Id.* ¶¶ 69–73.

[16]    Clark Aff. to *Straight Path* Compl., Ex. C, at 39–40.

[17]    *Straight Path* Compl. ¶71.

[18]    *Id.* ¶ 72.

Committee became increasingly concerned whether any potential bidders for Straight Path would have an interest in pursuing the Indemnification Claim against IDT post-closing or what value, if any, potential bidders might ascribe to the Indemnification Claim in their bids to acquire Straight Path.[19] On March 13, 2017, the Special Committee decided that it was in the best interests of Straight Path's stockholders to exclude the Indemnification Claim from any sale of Straight Path, and informed potential bidders of that determination.[20]

Around the same time, Davidi Jonas became aware of the Special Committee's interest in pursuing the Indemnification Claim and recognized that pursuing the claim could be harmful to his family's interests in IDT.[21] IDT had a market capitalization of less than $350 million and any successful enforcement of Straight Path's indemnification rights under the Separation Agreement would likely bankrupt IDT.[22] Presumably, Davidi Jones advised his father of the Special Committee's plans with respect to the Indemnification Claim and, on March 14th and 15th, Jonas intervened in the Straight Path sales process.[23]

---

[19] Clark Aff. to *Straight Path* Compl., Ex. C, at 39–40.

[20] *Straight Path* Compl. ¶ 75.

[21] *Id.* ¶¶ 76-78. Davidi Jonas and his siblings own over 10% of IDT's outstanding equity. His father, Howard, owned 11.3% of IDT's equity. *Id.*

[22] *Id.*

[23] *Id.* ¶ 79.

Jonas contacted each Special Committee member and threatened to blow up the sales process if they continued to adhere to their plan to preserve the Indemnification Claim against IDT post-closing.[24] His threat was credible given that Jonas was the controlling stockholder of Straight Path and his consent was required to approve any sale.[25] Jonas also threatened the Special Committee members personally in an effort to persuade them to settle the Indemnification Claim for a nominal amount.[26]

On March 15, 2017, an IDT representative advised Straight Path that Jonas was interested in acquiring the IP Assets as part of any settlement of the Indemnification Claim against IDT.[27] As discussions continued over the next few days, Jonas made clear he would not support a sale of Straight Path as a whole, but would consent to sell only the Spectrum Assets.[28] In addition, Jonas's counsel advised the Special Committee's counsel that Jonas would not support any

---

[24] *Id.* ¶ 83.

[25] *Id.* ¶ 80.

[26] *Id.*¶ 83.

[27] *Id.* ¶ 84.

[28] Clark Aff. to *Straight Path* Compl., Ex. C, at 42.

transaction that would enable the Indemnification Claim to be pursued against IDT post-closing.[29]

Realizing that it had no other options if it did not want to risk a proposed third-party merger of Straight Path, the Special Committee acquiesced to Jonas's demands.[30] On April 9, 2017, Straight Path and IDT executed a binding term sheet under which Straight Path agreed to sell the IP Assets to IDT for $6 million and to settle the Indemnification Claim against IDT for $10 million plus a right to receive 22% of the net proceeds from any sale of the IP Assets (the "2017 Term Sheet").[31]

Meanwhile, the bidding continued for the Spectrum Assets and as of April 7, 2017, Verizon had proposed to acquire Straight Path for $1.262 billion. This created substantial liability for IDT under the Separation Agreement.[32] Given the increasing value of Straight Path's Indemnification Claim, the Special Committee attempted to extract additional settlement consideration from IDT. It didn't work.[33]

---

[29]     *Id.*; *Straight Path* Compl. ¶ 84.

[30]     *Straight Path* Compl. ¶ 86.

[31]     *Id.* ¶¶ 86–88.

[32]     Clark Aff. to *Straight Path* Compl., Ex. C, at 45-46.

[33]     *Id.* at 47.

After a bidding war between AT&T and Verizon, Verizon ultimately acquired Straight Path for a total enterprise value of $3.1 billion.[34] On February 28, 2018, the Verizon merger closed and, in accord with the Consent Decree's terms, the FCC collected $614 million.

## C. THE STRAIGHT PATH SHAREHOLDER LITIGATION COMMENCES.

The Straight Path shareholder litigation was initiated in our Court of Chancery in July 2017—three months after the 2017 Term Sheet was executed.[35] Two class actions were filed and later consolidated into the *Straight Path* Action.[36] A verified complaint was filed on August 29, 2017 (the "Underlying Complaint").[37]

The Underlying Complaint was brought as a class action directly challenging the Verizon merger and, in the alternative, derivatively on behalf of Straight Path.[38]

---

[34]     *Straight Path* Compl. ¶ 98.

[35]     Pls.' Compl. ¶ 41.

[36]     Pls.' Compl. ¶ 43. This case was there captioned *In Re Straight Path Communications Inc. Stockholder Litigation*, Case No. 2017-0486-SG.

[37]     Pls.' Compl. ¶ 44.

[38]     *Id.*

The named defendants in the Underlying Complaint were IDT, Howard Jonas, Davidi Jonas, the Patrick Henry Trust,[39] and Straight Path as a nominal defendant.[40]

The *Straight Path* Action has four counts:

- Count I alleges that Howard Jonas, in his capacity as the controlling stockholder of Straight Path, breached his fiduciary duties to the company and its stockholders.[41] Specifically, the Underlying Complaint asserts that Jonas used his position as a controlling stockholder to extract unique benefits from the sales process to the detriment of Straight Path's minority stockholders.[42] Those benefits included the acquisition of the IP Assets and settlement of the Indemnification Claim for well below fair value.[43]

- Count II alleges that Davidi Jonas breached his fiduciary duties to Straight Path and its stockholders by putting his personal interests and those of his family above those of the company and its stockholders.[44]

- Count III alleges that IDT aided and abetted Davidi Jonas and his father in their respective breaches of fiduciary duty.[45]

---

[39] *Straight Path* Compl. ¶ 21 (The Patrick Henry Trust was the trust established on July 31, 2013, and created to hold Howard Jonas's Class A Common Stock and Class B Common Stock in Straight Path.).

[40] Pls.' Compl. ¶ 44.

[41] *Straight Path* Compl. ¶¶ 102, 113, 120–124.

[42] *Id.* ¶ 122.

[43] The IP Assets were, in connection with the Consent Decree, previously valued at approximately $50 million. *Id.* ¶ 54, n.3.

[44] *Id.* ¶¶ 125–29.

[45] *Id.* ¶¶ 130–33.

- <u>Count IV</u> seeks a declaratory judgement and the imposition a constructive trust, but that request became moot upon the closing of the Verizon merger.[46]

In November 2017 letter opinion holding that the matter was not ripe for decision, the Court of Chancery concluded that the Straight Path shareholders were "in favor of the merger" with Verizon, and the claim against IDT "arise[s] from [Straight Path] assets transferred [in 2017] to another entity controlled by [Howard Jonas], which was a condition of his support for the merger" with Verizon.[47] In a later opinion denying the defendants' motion to dismiss the *Straight Path* Action, the Court found that the plaintiffs' claims were direct as opposed to derivative and, accordingly, survived the closing of the Verizon merger.[48]

After the *Straight Path* Action was filed in July 2017, IDT and Jonas tendered their claims seeking coverage under the insurance policies.[49] U.S. Specialty refused to defend them or pay defense costs.[50] National Union similarly refused coverage

---

[46]     *Id.* ¶¶ 134–39.

[47]     *See In re Straight Path Commc'ns Inc. Consol. Stockholder Litig.*, 2017 WL 5565264, at *1 (Del. Ch. Nov. 20, 2017).

[48]     *See In re Straight Path Commc'ns Inc. Consol. Stockholder Litig.*, 2018 WL 3120804 (Del. Ch. June 25, 2018).

[49]     Pls.' Compl. ¶ 48.

[50]     *Id.* ¶ 49.

for past and future loss, even if they exceeded the U.S. Specialty policy limits ($10 million for each of IDT and Jonas).[51] XL Specialty reserved its right to deny coverage for Jonas to the extent his loss is not indemnified or indemnifiable in connection with the *Straight Path* Action.[52] Upon denial of coverage by those Insurers, IDT and Jonas commenced this action.

The issue before this Court is whether the actions taken by Jonas as set forth in the Underlying Complaint in the *Straight Path* Action and the losses[53] associated therewith are covered by the terms of the subject insurance policies.

## III. LEGAL STANDARD

This Court cannot grant any party's motion for summary judgment under Delaware Superior Court Civil Rule 56 unless no genuine issue of material fact exists and that party is entitled to judgment as a matter of law.[54] Summary judgment

---

[51]     *Id.* ¶ 50.

[52]     *Id.* ¶ 51.

[53]     U.S. Specialty's policy defines "Loss" to include "Defense Costs" and any damages, settlements, judgments (including pre- and post-judgment interest) or other amounts that: (1) an Insured Person is legally obligated to pay as a result of any Claim, or (2) a Company is legally obligated to pay as a result of any Securities Claim. U.S. Specialty Policy ¶¶ Definition (G); Endorsement 5.

[54]     Del. Super. Ct. Civ. R. 56; *Motors Liquidation Co. DIP Lenders Trust v. Allianz Ins. Co.,* 2017 WL 2495417, at *5 (Del. Super. Ct. June 19, 2017), *aff'd sub. nom, Motors Liquidation Co. DIP Lenders Trust v. Allstate Ins. Co.,* 2018 WL 3360976 (Del. July 10, 2018);

will not be granted if there is a material fact in dispute[55] or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[56] The burden is on the moving party to demonstrate their claim is supported by undisputed facts.[57] If that burden is met, the non-moving party must demonstrate that "there is a genuine issue for trial."[58] And in determining whether there is, the Court must view the facts in the light most favorable to the non-moving party.[59]

The Court cannot grant a motion for summary judgment "[i]f . . . the record reveals that material facts are in dispute, or if the factual record has not been

---

[55] A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *see also In re Asb. Litigation*, 2006 WL 3492370, at *3 (Del. Super. Ct. Nov. 28, 2006); *Farmers Bank of Willards v. Becker*, 2011 WL 3925428, at *3 (Del. Super. Ct. Aug. 11, 2011).

[56] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[57] *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[58] Del. Super. Ct. Civ. R. 56(e). *See CNH Indus. Am. LLC,* 2015 WL 3863225, at *1 ("If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."); *see also Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979) ("If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight.").

[59] *Judah v. Del. Trust Co.*, 377 A.2d 624, 632 (Del. 1977) ("The facts must be viewed in the manner most favorable to the nonmoving party . . . with all factual inferences taken against the moving party and in favor of the nonmoving party.").

developed thoroughly enough to allow the Court to apply the law to the factual record . . . ."[60] But "a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[61]

These well-established standards and rules equally apply when, as here, the parties have filed cross-motions for summary judgment.[62] Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[63] But where cross-motions for summary judgment are filed and an issue of material fact exists, summary judgment is not appropriate.[64] To determine whether there is a genuine issue of material fact, the Court evaluates each motion

---

[60] *CNH Indus. Am. LLC*, 2015 WL 3863225, at *1.

[61] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999); *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[62] V*erizon Commc'ns Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118, at *5 (Del. Super. Ct. Mar. 2, 2017); *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001)).

[63] Del. Super. Ct. Civ. R. 56(h).

[64] *Motors Liquidation*, 2017 WL 2495417, at *5; *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008).

independently.[65]  And where it seems prudent to make a more thorough inquiry into the facts, summary judgment is denied and the matter submitted for resolution by trial.[66]

## IV.  DISCUSSION

### A. CHOICE OF LAW.

The insurance policies here contain no choice-of-law provisions.  In the absence of the parties' express choice of law, Delaware courts employ the "most significant relationship test" to determine which state's law applies.  Under that test the law of the jurisdiction bearing the most significant relationship to the insurance coverage as a whole is applied.[67]  IDT and Jonas urge that Delaware law should apply to govern their insurers' coverage obligations.[68]  The insurers argue that New Jersey law should apply because the policy was issued to IDT in New Jersey, but

---

[65]    *Motors Liquidation*, 2017 WL 2495417, at *5; *Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 167 (Del. Ch. 2003).

[66]    *Ebersole.* 180 A.2d at 470-72; *Pathmark Stores, Inc. v. 3821 Associates, L.P.*, 663 A.2d 1189, 1191 (Del. Ch. 1995) ("[S]ummary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[67]    *See generally Certain Underwriters at Lloyds, London v. Chemtura,* 160 A.3d 457 (Del. 2017); *Travelers Indem. Co. v. CNH Indus. Am. LLC,* 2018 WL 3434562 (Del. July 16, 2018). *See, e.g.*, *Liggett Gp., Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 145 (Del. Super. Ct. 2001) (applying North Carolina law to over one-hundred policies because North Carolina had the most significant relationship to the coverage as a whole).

[68]    Pls.' Br., at 15–16. *See also* Tr. for Oral Argument on Cross-Mots. For Summ. J. held on Oct. 12, 2018 [hereinafter "O.A. Tr."], at 6–7 (Pls.' Argument).

concede that "there is no apparent conflict" on the *relevant* coverage issues between the laws of the two states.[69]

Delaware courts recognize that, where possible, a court should avoid a choice-of-law analysis altogether if the result would be the same under the law of either of the competing jurisdictions.[70] Here, the Court divines no material or significant differences between the laws of Delaware and New Jersey with respect to this coverage dispute.[71]

If these parties' concessions and the Court's inability to detect a true conflict weren't enough, there is one more thing. Delaware courts have consistently held that Delaware law should be applied to resolve disputes over insurance coverage of directors' and officers' liability. When they must engage the multifaceted "most

---

[69] Defendant U.S. Specialty Ins. Co.'s Opening Br. in Supp. of Its Cross-Mot. for Summ. J. [hereinafter "U.S. Specialty Opening Br."] at 11, n.4. *See also* O.A. Tr., at 30 (U.S. Specialty's Argument) ("I don't see [choice of law] as an issue. Plaintiffs have not identified any difference in the law between Delaware and New Jersey in terms of how these cases are interpreted"); Defendant National Union Fire Ins. Co. of Pittsburgh, PA's Opening Br. in Supp. of its Mot. for Summ. J. [hereinafter "National Union Br."], at 13 (arguing that "New Jersey law should govern," but conceding that "[t]he relevant principles of policy interpretation that are at issue on this motion are substantial the same in both New Jersey and Delaware.").

[70] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010). *See Laugelle v. Bell Helicopter Textron, Inc.,* 2013 WL 5460164, at *2 (Del. Super. Ct. Oct. 1, 2013) ("[I]t must be first determined that there is an actual—rather than no or merely a 'false'—conflict. If there is no actual conflict, 'the Court should avoid the choice-of-law analysis altogether.'"); *see also Lagrone v. Am. Mortell Corp.*, 2008 WL 4152677, at *5 (Del. Super. Ct. Sept. 4, 2008) ("In such instances of 'false conflicts' of laws, the Court may resolve the dispute without a choice between the laws of the competing jurisdictions.").

[71] And the insurers do not object to the application of Delaware law. *See* O.A. Tr., at 30 (U.S. Specialty's Argument) ("I don't see [choice of law] as an issue.").

significant relationship" test, Delaware courts recognize that for directors' and officers' liability, "the insured risk is the directors' and officers' 'honesty and fidelity' to the corporation[.]"[72]  So, "the state of incorporation has the most significant relationship" because the policy is issued pursuant to Delaware law,[73] and "Delaware's law ultimately determines whether a director or officer of a Delaware corporation" breaches his or her fiduciary duties.[74]

Here, IDT and Straight Path are both Delaware corporations.[75]  The insurance policies covered directors' and officers' liabilities, and the *Straight Path* Action asserts claims against Jonas and IDT for purported breaches of fiduciary duty owed to Straight Path.  The merits of those claims are (or have been) determined under Delaware law.  Thus, under any choice-of-law analysis, Delaware law bears the "most significant relationship" to the issues of the insurers' coverage liability here.  And, the Court, therefore, finds Delaware law is the appropriate governing authority.

---

[72]  *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *6 (Del. Super. Ct. Nov. 5, 2010).

[73]  *Id.* (citing to DEL. CODE ANN. tit. 8, § 145, which provides for indemnification of, among others, officers and directors).

[74]  *Id.*

[75]  *Straight Path* Compl. ¶ 28; Pls.' Compl. ¶ 8.

## B. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND U.S. SPECIALTY'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE COVERAGE OF DEFENSE COSTS IN THE *STRAIGHT PATH* ACTION.

Jonas, IDT, and U.S. Specialty submit cross-motions for summary judgment with respect to U.S. Specialty's duty to defend Jonas and IDT in the *Straight Path* Action.[76] Because both sides make substantially the same arguments in their respective papers, the Court addresses their respective motions together.

### 1. APPLICABLE RULES OF CONTRACT INTERPRETATION FOR INSURANCE POLICIES.

Insurance policies are contracts.[77] It is a well-established principle that "[u]nder Delaware law, the interpretation of contractual language, including that of insurance policies, is a question of law."[78] The objective is to give effect to the parties' mutual intent at the time of contracting.[79] In construing the language of a contract, the Court should interpret the language in the same manner as it "would be

---

[76] Pls.' Br. ¶ 1; U.S. Specialty Opening Br. ¶ 2.

[77] *Goggin v. National Union Fire Ins. Co. of Pittsburgh,* 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018); *Cont'l Ins. Co. v. Burr*, 706 A.2d 499, 500–01 (Del. 1998) (". . . an insurance policy is a contract of adhesion …"); *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) (". . . an insurance policy is an adhesion contract . . .").

[78] *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 286 (Del. 2001). *See also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("Whether [a] contract's material terms are sufficiently defined is mostly, if not entirely, a question of law."); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1263 (Del. 2017) ("The proper construction of any contract ... is purely a question of law[.]").

[79] *Exelon Generation Acquisitions*, 176 A.3d at 1263.

understood by an objective, reasonable third party."[80]  Absent ambiguity, all contract terms—including those in insurance policies—should be accorded their plain, ordinary meaning.[81]  A contract term is not ambiguous merely because the parties disagree on its meaning.[82]  Rather, ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[83]

Because an insurance policy is "an adhesion contract and is not generally the result of arms-length negotiation," the rules of construction "differ from those applied to most other contracts."[84]  Where there is ambiguity in the policy language, the doctrine of *contra proferentem* requires that the insurance contract be construed most strongly against the insurer and in favor of the insured because the insurer is the drafter of the policy.[85]  In construing an ambiguous policy term, the Court looks to "the reasonable expectations of the insured at the time when he entered into the contract[.]"[86]  But this rule is applicable only where the policy language is indeed

---

[80]     *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).

[81]     *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *Goggin v. National Union Fire Ins. Co. of Pittsburgh,* 2018 WL 6266195, at *4.

[82]     *Id.*

[83]     *Id.*

[84]     *Hallowell*, 443 A.2d at 926.

[85]     *Id.* (citing *Steigler v. Insurance Co. of North America*, 384 A.2d 398, 400 (Del. 1978); *Novellino v. Life Ins. Co. of North America*, 216 A.2d 420, 422 (Del. 1966)).

[86]     *Id.* at 927.

ambiguous.[87] When an insurance contract's language is "clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them."[88] And when that language "is clear and unequivocal, [each] party will be bound by its plain meaning."[89]

Now, the Court must decide whether the *Straight Path* Action presents a claim or claims covered under the U.S. Specialty, National Union, or XL Specialty insurance policies.

## 2. *THE TERMS OF THE U.S. SPECIALTY POLICY.*

U.S. Specialty's policy covers the period from June 6, 2016, to June 6, 2017, which is when the alleged actions giving rise to the *Straight Path* Action occurred. Insuring Agreement (B) of the U.S. Specialty's policy states as follows:

> (B) The Insurer will pay to or on behalf of the **Company** **Loss** arising from:
>
> (1) **Claims**[90] first made during the Policy Period or the Discovery Period (if applicable) against the **Insured Persons** for **Wrongful Acts**, if the **Company** has paid

---

[87] *Id.* at 926.

[88] *Id.*

[89] *Id.*

[90] A "Claim" includes, among other things, "any written demand for monetary or non-monetary," and "any civil proceeding commenced by service of a complaint or similar pleading." See U.S. Specialty policy at Definitions (B)(2). U.S. Specialty does not dispute that the *Straight Path* Action is a "Claim" made during the "Policy Period."

such Loss to or on behalf of the **Insured Persons** as indemnification or advancement, and/or

(2) **Securities Claims** first made during the Policy Period or the Discovery Period (if applicable) against the **Company** for **Wrongful Acts**.[91]

Put more succinctly, U.S. Specialty is liable for the "Losses" (above the applicable self-insured retentions) incurred by IDT for (1) "Claims" against an "Insured Person" for "Wrongful Acts" and (2) "Securities Claims" against the "Company" for "Wrongful Acts."  A look at each of the foregoing defined terms in the U.S. Specialty policy is necessary to determine whether U.S. Specialty's duty to pay defense costs has been triggered by the *Straight Path* Action.

### 3. U.S. SPECIALTY HAS THE DUTY TO DEFEND JONAS IN THE STRAIGHT PATH ACTION BECAUSE HIS ACTIONS CONSTITUTE "WRONGFUL ACTS."

The first question is whether Jonas is an "Insured Person" who has engaged in "Wrongful Acts" through the conduct alleged in the *Straight Path* Action.  The U.S. Specialty policy defines an "Insured Person," in relevant part, as "any past, present or future director or officer of the Company."[92]  The "Company" is IDT.[93] Under those definitions, Jonas is an "Insured Person" under the U.S. Specialty

---

[91] Pls.' Compl. ¶ 17; Pls.' Compl. Ex. A ¶ Insuring Agreement (emphasis in original).

[92] *Id.* ¶ Definition (F).

[93] *Id.* ¶¶ Definitions (C), (O), Endorsement No. 32, Endorsement No. 3.

policy. He was the Chairman of IDT's board of directors during the events that spawned the *Straight Path* Action.[94]

As an Insured Person under the U.S. Specialty policy, Jonas must be covered if the actions alleged in the *Straight Path* Action constitute "Wrongful Acts." The U.S. Specialty policy defines "**Wrongful Act**" to include any:

> (1) actual or alleged act, error, misstatement, misleading statement, neglect, omission or breach of duty: (a) by an Insured Person in his capacity as such, including . . . while acting as a Controlling Person, or (b) with respect only to Securities Claims, by the Company; or
>
> (2) matter claimed against an Insured Person solely by reason of his or her service in such capacity.[95]

Central to the current dispute is the first defined type of "Wrongful Act." The Court finds the terms of the U.S. Specialty policy unambiguous. Its plain language is not "susceptible to more than one meaning."[96] So, to construe the meaning of "Wrongful Act," the Court gives the policy's words their plain, ordinary meaning.[97]

---

[94] Pls.' Compl. ¶ 25; U.S. Specialty Answer ¶ 25; *In re Straight Path Commc'ns Inc. Consol. Stockholder Litig.*, 2018 WL 3120804., at *2.

[95] U.S. Specialty Policy ¶¶ Definition (P)(1), Endorsement No. 6 (emphasis added).

[96] *Goggin,* 2018 WL 6266195, at *4; *Alta Berkeley VI C.V.*, 41 A.3d at 385.

[97] *Goggin,* 2018 WL 6266195, at *4; *Alta Berkeley VI C.V.*, 41 A.3d at 385.

### a. The "Covered" Conduct is Not Limited to Breach of Duty.

The definition of "Wrongful Act" provides a laundry list of conduct that might constitute a Wrongful Act. Despite many wide-ranging examples explicitly expressed therein, U.S. Specialty offers a narrow reading of this definition. U.S. Specialty seeks to essentially limit "Wrongful Acts" to conduct that constitutes "breach of duty."[98]

But "Wrongful Acts" are not limited only to conduct that constitutes a "breach of duty." Rather, Wrongful Acts encompass a broad array of specifically enumerated conduct. The types of conduct preceding in the list connects to "breach of duty" via a disjunctive "or."[99] And so, each term in the string must be afforded a separate and independent meaning.[100] "Breach of duty" does not absorb, or incorporate, or otherwise make the other exemplified conduct duplicative or meaningless. To the contrary, each term represents a separate, independent act that, if other requirements are satisfied, is capable of triggering coverage obligations under the U.S. Specialty policy. Therefore, in construing the language of the U.S.

---

[98]    U.S. Specialty Opening Br., at 15 (averring that the central questions are "(1) what duty was allegedly breached and (2) to whom that duty was owed.").

[99]    U.S. Specialty Policy ¶¶ Definition (P)(1), Endorsement No. 6.

[100]    *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (citing *United States v. Woods*, 571 U.S. 31, 45 (2013) ("[The] ordinary use [of 'or'] is almost always disjunctive, that is, the words it connects are to 'be given separate meanings'.")).

Specialty Policy, the Court finds that a "Wrongful Act" is not limited to a "breach of duty." Any conduct that is an "act," or an "error," or a "misstatement," or a "misleading statement," or "neglect," or an "omission" could be a "Wrongful Act."

### b. *Jonas Acted in His Insured Capacity that Gave Rise to the Straight Path Action.*

To be a "Wrongful Act" under the U.S. Specialty policy, the conduct must be taken "by an Insured Person in [his] capacity as such[.]"[101] Because Jonas' "Insured Person" status is based on his position as IDT's Chairman, his insured capacity must necessarily derive from acts taken in his capacity as IDT's Chairman. On this the parties agree.[102] The parties dispute, however, whether the conduct must be taken in, and *solely* in, Jonas's capacity as IDT's Chairman, and not in his capacity as Straight Path's controlling stockholder.

U.S. Specialty takes the position that the Court should only look at "the capacity *characterized* by the Underlying Complaint."[103] That is, U.S. Specialty relies exclusively on how the Underlying Complaint characterizes Jonas's alleged

---

[101] U.S. Specialty Policy ¶¶ Definition (P)(1), Endorsement No. 6 (emphasis added).

[102] Pls.' Br., at 23 ("To this respect, he is alleged to have been acting solely in his capacity as IDT's Chairman . . ."); U.S. Specialty Opening Br., at 17 ("[T]he Underlying Complaint does not assert any Claim against Jonas for actions he took in his insured capacity as chairman or controlling stockholder of IDT.").

[103] U.S. Specialty Opening Br., at 15–16 (citing to numerous allegations against Jonas characterized in the *Straight Path* Compl.) (emphasis added); U.S. Specialty Opp'n, at 12–13 (the same).

misconduct.[104]   According to U.S. Specialty, because the claim against Jonas is characterized as a "breach of his fiduciary duties" to Straight Path as Straight Path's controlling stockholder,[105] and not to IDT, those acts could not have been committed in Jonas's insured capacity as IDT's Chairman.[106]   In truth, this is just a slight variation on the prior argument that the only "Wrongful Acts" covered by the insurance policies are for breach of fiduciary duty.   Such a reading of the U.S. Specialty policy is inconsistent with Delaware law interpreting such insurance policies.

In determining whether the duty to defend and advance defense costs is triggered, the Court must examine whether "the underlying complaint alleges facts that fall within the scope of coverage."[107]  Although the Court looks to the allegations of the underlying complaint, the Court is not "limited to the plaintiff's unilateral characterization of the nature of [its] claims."[108]   Rather, the Court reviews "the complaint as a whole" and considers "all reasonable inferences that may be drawn

---

[104]     U.S. Specialty Opening Br., at 15–16; U.S. Specialty Opp'n, at 12–13.

[105]     U.S. Specialty Opening Br., at 15–16; U.S. Specialty Opp'n, at 13 (referencing to *Straight Path* Compl. ¶ 122).

[106]     U.S. Specialty Opening Br., at 16–17.

[107]     *Verizon Commc'ns*, 2017 WL 1149118, at *6 (finding that the same law applies in Delaware and New York regarding the duty to defend and to advance defense expenses).

[108]     *Id.* at *7.

from the alleged facts."[109]   The key is "whether the allegations of the complaint, when read as a whole, assert 'a risk within the coverage of the policy.'"[110]

The Court here looks beyond the *characterization* of the acts alleged by the *Straight Path* plaintiffs and examines those *acts* to determine if they were taken by Jonas in his insured capacity as IDT's Chairman.

The Underlying Complaint provides a detailed account of Jonas's alleged wrongdoing.  It alleges Jonas served as IDT's Chairman and CEO during the 2011–2012 period when IDT's fraudulent conduct occurred that resulted in the Consent Decree.[111]   The Underlying Complaint describes and explains that the financial hardship imposed by the Consent Decree[112]—coupled with IDT's indemnification obligation to Straight Path for pre-Spin-Off liabilities incurred under the Separation Agreement[113]—prompted Jonas to interfere with Straight Path's sale process.[114] The Underlying Complaint alleges that Jonas leveraged his voting control in Straight

---

[109]     *Blue Hen Mech., Inc. v. Atl. States Ins. Co.*, 2011 WL 1598575, at *2 (Del. Super. Ct. Apr. 21, 2011), *aff'd*, 29 A.3d 245 (Del. 2011).

[110]     *Verizon Commc'ns*, 2017 WL 1149118, at *7 (citing *Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)).

[111]     *Straight Path* Compl. ¶ 18.

[112]     *Id.* ¶¶ 52–55.

[113]     *Id.* ¶ 36.

[114]     *Id.* ¶ 81.

Path in exchange for Straight Path relinquishing the right to pursue its Indemnification Claim against IDT post-closing, and selling its IP Assets to IDT.[115] The Underlying Complaint further avers that Jonas got his way. The 2017 Term Sheet entered into between IDT and Straight Path provided Straight Path stockholders with only nominal consideration for the IP Assets and the Indemnification Claim.[116]

Read as a whole, the *Straight Path* Action, paints a picture of Jonas singlehandedly furthering his own and IDT's interests at the expense of Straight Path and its stockholders. In examining the nature of the claims and alleged acts, the Court finds that the Underlying Complaint has sufficiently asserted "a risk within the coverage" of the U.S. Specialty policy. That is, Jonas took the alleged wrongful actions he did for the benefit of IDT and himself in his capacity as the Chairman of IDT. The fact that Jonas may at the same time also be a controlling stockholder of Straight Path and breaching his concomitant fiduciary duties there does not mean that his actions weren't taken in his capacity as an IDT officer.[117] Had U.S. Specialty

---

[115]     *Id.* ¶¶ 80–85, 93–94.

[116]     *Id.* ¶¶ 88–91, 99.

[117]     *See Continental Copper & Steel Industries, Inc. v. Johnson*, 491 F. Supp. 360 (S.D.N.Y. 1980) (finding that coverage existed for actions taken in a dual capacity under similar policy language and similar facts).

intended the coverage to be so limited, it should have, and could have, drafted the policy accordingly.

   **4. *U.S. SPECIALTY HAS NO DUTY TO DEFEND IDT BECAUSE THE STRAIGHT PATH ACTION IS NOT A "SECURITIES CLAIM."***

Does U.S. Specialty have a separate duty to defend IDT in the *Straight Path Action*? With respect to the claims against IDT, U.S. Specialty has the obligation to provide coverage for "Securities Claims [] against the Company for Wrongful Acts."[118] There is no dispute that IDT, being the Named Corporation, is within the meaning of "Company."[119] But is the *Straight Path* Action a "Securities Claim?"[120]

Under the U.S. Specialty policy, **Securities Claim** means a Claim which:

> (1) is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or
>
> (2) arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.[121]

---

[118]    U.S. Specialty Policy ¶ Insuring Agreement (B)(2).

[119]    *Id.* ¶¶ Declarations, Item 1; Definition (H); Endorsement 32; *see also* Pls.' Br., at 24; U.S. Specialty Opening Br., at 20.

[120]    U.S. Specialty Policy ¶¶ Definition (P); Endorsement 6 ("Wrongful Act" is an "actual or alleged act, error, misstatement, misleading statement, neglect, omission or breach of duty . . . (b) with respect only to Securities Claims, by the Company[.]").

[121]    Pls.' Compl. Ex. A ¶ Definition (N).

IDT argues that the *Straight Path* Action is a Securities Claim under both definitions.[122]   U.S. Specialty contends that the *Straight Path* Action satisfies neither.[123]

### a. The Straight Path Action is Not a Securities Claim Because It Was Brought by Straight Path's Securities Holders, not IDT.

To fall under the first part of the definition of a "Securities Claim," a claim must be brought by "securities holders of the Company."[124]   The U.S. Specialty policy defines "Company" to include "the Named Corporation," here IDT, and any "Subsidiary" thereof.  The U.S. Specialty policy defines a "Subsidiary," in relevant part, as:

> . . . any entity, including any limited liability company[]:
>
> (1)   during any time on or before the inception of the **Policy Period** in which the **Named Corporation** owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors or managers (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**; . . .

---

[122]   Pls.' Br., at 23–24.

[123]   U.S. Specialty Opening Br., at 19–20.

[124]   U.S. Specialty Policy ¶ Definition (N)(1).

- 31 -

An entity ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors or managers (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**."[125]

Because the *Straight Path* Action is brought by securities holders of Straight Path, the *Straight Path* Action can only be a Securities Claim under the first provision if Straight Path is a Subsidiary of IDT during the relevant time period.[126]

IDT doesn't deny that it ceased to hold "more than 50% of the voting rights" of Straight Path after the 2013 Spin-Off.[127]  Nevertheless, it argues, Straight Path continues to qualify as IDT's Subsidiary under the policy because "Straight Path's role as a Subsidiary" pre-Spin-Off is "central to the *Straight Path* Action."[128]  Put

---

[125]  *Id.* ¶¶ Definitions (O), Endorsement No. 3.

[126]  *See also* Pls.' Br., at 24 (conceding that "the Straight Path Action is a 'Securities Claim' as long as Straight Path is a 'Company' under the Policy[.]").

[127]  Pls.' Br., at 24–25.

[128]  *Id.* (emphasis added).

another way, IDT proposes that a former subsidiary of IDT is within the meaning of "Subsidiary" under the U.S. Specialty policy so long as the former subsidiary's role is purportedly pivotal to the Underlying Complaint. This Court can't buy into IDT's attempted rewrite of the policy's terms.

In construing the term "Subsidiary," the Court finds that the policy language is clear and unambiguous and must, therefore, afford those terms their plain and ordinary meaning.[129] The policy language provides that an entity qualifies as a Subsidiary under the policy if IDT owns more than 50% of its voting rights. That entity ceases to be a Subsidiary when IDT no longer owns more than 50% of its voting rights.[130] The definition of "Subsidiary" specifies that the benchmark is "more than"[131]—not "equal to," not "no less than,"—50% of the entity's voting rights. And the definition's calculation for voting control accounts for direct and indirect control "through one or more other Subsidiaries"[132]; it thereby makes clear that for indirect control to be taken into account, the intermediary must also qualify as a Subsidiary.[133] The "Subsidiary" definition in no way includes, either expressly

---

[129]    *Goggin,* 2018 WL 6266195, at *4; *Alta Berkeley VI C.V.*, 41 A.3d at 385.

[130]    U.S. Specialty Policy ¶¶ Definition (O); Endorsement 3.

[131]    *Id.* ¶¶ Definition (O); Endorsement 3.

[132]    *Id.*

[133]    *Id.*

- 33 -

or impliedly, language that allows a former subsidiary to continue to constitute a Subsidiary under any other circumstances.

Reading the plain language of the policy, the Court rejects IDT's proposed rewriting of its terms and finds that as of the effective date of the 2013 Spin-Off, Straight Path ceased to be a Subsidiary of IDT. The Wrongful Acts alleged in the *Straight Path* Action took place in 2017—four years after Straight Path ceased to be a subsidiary of IDT—when IDT is alleged to have aided and abetted Straight Path's release of its Indemnification Claim. Therefore, Straight Path does not fall within the definition of "Company." Accordingly, the *Straight Path* Action does not constitute a "Securities Claim" under the first part of the definition because the *Straight Path* Action was not brought by IDT's securities holders.

### b. The Straight Path Action is Not a Securities Claim Because a Spin-Off is Not a "Sale of Securities."

The second prong of the "Securities Claim" definition requires that the claim against IDT in the *Straight Path* Action "arises[] from the purchase or sale of . . . any securities issued by the Company . . ."[134] This unambiguous language must be afforded its ordinary meaning.[135]

---

[134]    *Id.* ¶ Definition (N)(2).

[135]    *Goggin,* 2018 WL 6266195, at *4; *Alta Berkeley VI C.V.*, 41 A.3d at 385.

Given that the Court has determined that Straight Path is not a Subsidiary under the U.S. Specialty policy and is, therefore, outside of the meaning of "Company," this second provision of the "Securities Claim" definition can only be satisfied if the claim against IDT in the *Straight Path* Action "arises from the purchase or sale of securities issued by IDT." IDT says it does.

According to IDT, the *Straight Path* Action arises from Straight Path's sale of its IP Assets and settlement of its Indemnification Claim against IDT due to Jonas's coercion.[136] Jonas was in a position to exert such pressure because of his dual control of both Straight Path and IDT after the Spin-Off.[137] The terms of the Spin-Off provided that each IDT shareholder received one share of Straight Path stock for every two shares of IDT stock owned.[138] IDT claims that because the Spin-Off involved IDT shares, it "may be deemed a purchase and sale of securities for purposes of triggering insurance coverage under the U.S. Specialty Policy."[139]

IDT's posits that the Spin-Off is a "sale of securities."[140] Yet federal and various state courts have consistently held that a spin-off is not a "purchase or sale

---

[136]    Pls.' Br., at 28.

[137]    *Id.*

[138]    *Id.*

[139]    *Id.*

[140]    *Id.*

of securities" within the meaning of the Securities Act of 1933 because it does not affect a fundamental change in the stockholders' holdings.[141]  Moreover, the word "spin-off" is merely a short-hand term used in corporate transactional parlance for a certain type of dividend.  That is, one in which a parent corporation distributes all of the shares of one of its wholly-owned subsidiary corporations to its existing stockholders.[142]  Under 8 *Del. C.* §173, [d]ividends may be paid in cash, in property, or in shares of the corporation's capital stock."  Accordingly, in Delaware statutory terms, a "spin-off" is a dividend paid in the property of the parent corporation, *not* a sale of its securities.[143]

Accordingly, IDT's argument that the Spin-Off here was a "sale of securities" fails.  The Court finds that the *Straight Path* Action does not implicate a "Securities

---

[141]     *Rathborne v. Rathborne*, 683 F.2d 914, 918 (5th Cir. 1982); *Isquith v. Caremark International Inc. et al.*, 1997 WL 162881, at *6 (N.D. Ill Mar. 26, 1997), *aff'd*, 136 F.3d 531 (7th Cir. 1998), *cert. denied*, 525 U.S. 920 (Oct. 5, 1998); *Fed. Ins. Co. v. Campbell Soup Co.*, 2004 WL 1631405, at *9 (N.J. Super. Ct. Law Div., July 2, 2004).  *See also* SEC Staff Legal Bulletin No. 4 Staff Legal Bulletin No. 4 (Cf), Release No. SLB-4 (CF) (Sept. 16, 1997); ISSUE NO. 239, Corp. Governance Guide 35990017.

[142]     *See, generally, Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1172 (Del. 1988); *In re MCA, Inc.*, 598 A.2d 687,690 (Del. Ch.1991) (referring to a spin-off as a stock dividend).

[143]     IDT and Jonas suggest that this Court's decision in *Verizon Communications Inc. v. Illinois National Insurance* supports their broad view that any spin-off constitutes a purchase or sale of securities.  But the facts surrounding Verizon's 2006 spin-off of its print and electronic directories business, and the specific policy language at issue there, are far different than the facts and policy language here.

Claim" under any natural reading of the definition.  And so, U.S. Specialty is not obligated to provide for IDT's defense in the *Straight Path* Action.

## C. NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT.

National Union issued a first layer policy for an aggregate liability of $10 million in excess of the primary U.S. Specialty policy issued to IDT.[144]  In its summary judgment motion, National Union incorporates U.S. Specialty's arguments with respect to the coverage obligations for Jonas, asserting that because the *Straight Path* Action is not a claim against Jonas for Wrongful Acts, National Union's obligation to provide any excess coverage is not triggered.[145]  In addition to U.S. Specialty's arguments, National Union also says that it is not obligated to provide coverage for IDT's defense costs for the *Straight Path* Action.[146]  For the reasons now explained, the Court **GRANTS** National Union's motion with respect to its coverage obligations for IDT, and **DENIES** its motion with respect to its duty to defend Jonas.

The Court has concluded that the *Straight Path* Action constitutes a "Wrongful Act" taken by Jonas in his insured capacity as IDT's Chairman.[147]

---

[144]     National Union Br., at 5; Ex. B (National Union Excess Policy) ¶ Declarations.

[145]     National Union Br., at 1.

[146]     National Union Br., at 1–2.

[147]     *See supra*, Section IV.B.1.

Accordingly, the Court finds that National Union has the obligation to provide coverage for Jonas in connection with the *Straight Path* Action under the terms and conditions of the National Union's excess policy. But does the *Straight Path* Action trigger National Union's coverage obligation for IDT?

Under the National Union excess policy language, it (1) "attaches only after" the total limits of the $10 million primary policy issued by U.S. Specialty have been fully exhausted;[148] (2) follows the terms, conditions, and limitations contained in the primary U.S. Specialty Policy; but (3) may be subject to certain terms of its own.[149]

With respect to this motion, no terms of the National Union excess policy alter or otherwise amend the relevant terms and conditions of the U.S. Specialty policy it lay under. In turn, National Union's arguments (and their resolution) follow U.S. Specialty's: the *Straight Path* Action is not a "Securities Claim" under either of the definitions.[150]

But with respect to the second provision requiring that a Securities Claim arises from the sale of securities, National Union makes an additional argument.[151]

---

[148]    National Union Excess Policy ¶ Insuring Agreement. Above the Court has found that U.S. Specialty has the duty to defend Jonas, but not IDT. Therefore, the National Union policy limit available to IDT is the amount of $10 million, but that is only for coverage obligations for Jonas. *See Supra*, Section IV.B.

[149]    *Id.*

[150]    National Union Br., at 12–23.

[151]    *Id.*, at 4, 20–24 (citing authorities of both New Jersey and Delaware).

National Union says the term "arising out of," requires a "meaningful nexus" between the Spin-Off and the claims against IDT brought in the *Straight Path* Action.[152] And, National Union says no such linkage exists between the Spin-Off and the allegations against IDT set forth in the *Straight Path* Action.[153]

The Court need not consider National Union's additional argument on the meaning of "arising out of." Having concluded that the primary insurer, U.S. Specialty, has no duty to defend IDT in the *Straight Path* Action, National Union's obligation to provide excess coverage for IDT is not triggered. Thus, the Court **GRANTS** National Union's Motion for Summary Judgment with respect to its coverage obligation for IDT. The Court, in accordance with its preceding discussions herein, **DENIES** National Union's Motion for Summary Judgment to the extent National Union seeks to be excused from coverage obligation to Jonas in the *Straight Path* Action.

### D. XL SPECIALTY'S MOTION FOR SUMMARY JUDGMENT.

XL Specialty contends it has no coverage obligations to IDT in the *Straight Path* Action under the Side A policy it issued to IDT.[154] The Side A Policy provides

---

[152]    *Id.*, at 21–23.

[153]    *Id.*, at 23–24.

[154]    XL Specialty Ins. Co's Opening Br. in Support of its Mot. for Summ. J. and Joinder [hereinafter "XL Specialty Br."], at 1.

coverage for Jonas's losses in excess of the indemnification provided by IDT, up to the policy limit.[155]

XL Specialty's attack is two-fold. First, it incorporates U.S. Specialty's arguments that the *Straight Path* Action is not a claim for "Wrongful Acts" because it is not brought against Jonas in his insured capacity.[156] Second, XL Specialty claims that a declaratory judgment on the scope of coverage is premature for adjudication because no "actual controversy" currently exists.[157]

Having already concluded that Jonas's actions complained-of in the *Straight Path* Action do constitute "Wrongful Acts" undertaken by Jonas in his capability as IDT's Chairman,[158] the Court moves directly to XL Specialty's second argument.

XL Specialty issued the Side A Policy for Management Liability to IDT for the period of June 6, 2016, to June 6, 2017.[159] The Insuring Agreement states:

> The **Insurer** will pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** . . . for a **Wrongful Act**, except to the extent that such Loss is paid by any other **Insurance Program**

---

[155] Pls.' Compl. ¶ 5; Pls.' Compl. Ex. C [hereinafter "XL Specialty Policy"].

[156] *Id.* ¶¶ 1–2, 4–7. The definition of a "Wrongful Act" in the XL Specialty Policy is substantively identical to that in the U.S. Specialty Policy with some inconsequential differences in the wording. Thus, the Court already decided the merits of XL Specialty's first argument above when it resolved the same against U.S. Specialty. *See supra*, Section IV.B.1.

[157] XL Specialty Br. ¶¶ 2, 7–10.

[158] *Supra*, Section IV.B.1.

[159] Pls.' Compl. ¶ 31; XL Specialty Policy.

or as indemnification or advancement from any source. In the event that **Loss** is not paid by such other insurance or as indemnification or advancement, this Policy will respond on behalf of the **Insured Persons** as if it were primary . . .[160]

"Insured Persons" include "any past, present, or future director or officer[.]"[161] There is no dispute that Jonas qualifies as an "Insured Person" under the Side A Policy,[162] or that there has not yet been a judgment or claim for payment.[163] The contention is whether a declaratory judgment is appropriate absent a judgment against the insured. Here, the Court finds it is.

The principle impetus of a declaratory judgment is "to promote preventive justice [] where an injury has not yet occurred."[164] The decision to issue a declaratory judgment is within the Court's discretion.[165] And the discretion to

---

[160] XL Specialty Policy ¶ Insuring Agreement.

[161] *Id.* ¶¶ Definitions (I); Endorsement No. 7.

[162] XL Specialty Br., at 3; Pls.' Opp'n to Defendant XL Specialty Ins. Co.'s Mot. for Summ. J. and Joinder [hereinafter "Pls.' Opp'n to XL Specialty"], at 4.

[163] XL Specialty Br., at 2, 7–10; Pls.' Opp'n to XL Specialty, at 2–3, 14–19.

[164] *Lamourine v. Mazda Motor of Am., Inc.*, 2006 WL 2767021, at *3 (Del. Super. Ct. Aug. 28, 2006). *See also Bank of Delaware v. Allstate Ins. Co.*, 448 A.2d 231, 234 (Del. Super. Ct. 1982) (citing *Clemente v. Greyhound Corporation*, 155 A.2d 316, 320 (Del. Super. Ct. 1959) ("[T]he principal reason for the invention of the declaratory judgment procedure was to enable the law of a case to be determined before mere differences ripen into actual injuries.")).

[165] *XI Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014) (citing *Gannett Co., Inc. v. Bd. of Managers of the Delaware Criminal Justice Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003) ("This Court reviews for abuse of discretion the Superior Court's decision to exercise declaratory judgment jurisdiction over a case.")).

assume, or not to assume the jurisdiction lies fully with the Court—"the only limitation being that the Court cannot abuse its discretion."[166] The Court may "liberally exercise" its discretion to entertain a declaratory judgment "so that the remedial purpose [] may be well served."[167] But the Court may not exercise that discretion "unless the action presents an actual controversy."[168]

"The prerequisites of a controversy" require that "the issue involved . . . be ripe for judicial determination."[169] When determining if a declaratory judgment claim satisfies the ripeness requirement, the Court "must weigh the reasons 'for not rendering a hypothetical opinion . . . against the benefits to be derived from the rendering of a declaratory judgment.'"[170] That determination is largely "a matter of practical common sense."[171]

---

[166] *See Clemente*, 155 A.2d at 321; *Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. Ct. 1990); *Mr. Kleen, LLC v. New Castle Cty. Dep't of Special Servs.*, 2014 WL 4243562, at *7 (Del. Super. Ct. Aug. 19, 2014).

[167] *Schick Inc. v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1238 (Del. Ch. 1987).

[168] *XI Specialty Ins.*, 93 A.3d at 1216 (internal quotation omitted); *see also Stroud v. Milliken Enter., Inc.*, 552 A.2d 476, 479 (Del. 1989).

[169] *Lamourine*, 2006 WL 2767021, at *3 (citing *Schick*, 533 A.2d 1235, 1238 (Del. Ch. 1987) (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660 (Del. 1973))).

[170] *Id.* (citing *Stroud*, 552 A.2d at 480).

[171] *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1137 (Del. Super. Ct. 1992) (citing *Schick*, 533 A.2d at 1239).

And that application of practical common sense requires a balancing of: "(1) a practical evaluation of the legitimate interests of the plaintiff in a prompt resolution of the question presented; (2) the hardship that further delay may threaten; (3) the prospect of future factual development that might affect the determination made; (4) the need to conserve scarce resources; and (5) a due respect for identifiable policies of law touching upon the subject matter in dispute."[172]

Applying this balancing to entreaties for declaratory judgment, Delaware courts have concluded that the exercise of discretion may be proper in settling a question of an insurer's liability[173] or determining an insurer's duty to defend.[174] But a duty-to-indemnify claim is unripe for declaration.[175] For the reasons below, the Court here finds that assuming jurisdiction for this declaratory judgment is appropriate.

---

[172] *See Mine Safety Appliances Co. v. AIU Ins. Co.*, 2014 WL 605753, at *3 (Del. Super. Ct. Jan. 21, 2014); *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 565 A.2d 268, 274 (Del. Super. Ct. 1989); *Schick*, 533 A.2d at 1239.

[173] *Harleysville Mut. Cas. Ins. Co. v. Carroll*, 123 A.2d 128, 131 (Del. Super. Ct. 1956) (holding that under Delaware's Declaratory Judgments Act, "[t]he question of liability under insurance contracts has proved to be particularly susceptible to declaratory adjudication . . . even though judgment has not been obtained against the party who asserts coverage.").

[174] *Bank of Delaware*, 448 A.2d at 235–36 (granting declaratory judgment on provisions of complaint regarding insurer's duty to defend, and denying claims as to determination of financial liability upon judgment that involve the application and effect of a federal law on the agreements to indemnify).

[175] *Id.* (refusing to exercise discretion on declaratory judgment on issues relating to determination of financial liability under a federal environmental law).

With respect to the first factor requiring a practical evaluation of the plaintiff's legitimate interest, Jonas is an Insured Person under the Side A Policy and is entitled to defense costs and/or indemnification under that policy, subject to its terms and conditions, for Loss that is not paid by any other Insurance Program or as indemnification from another source.

As to the second factor, a delay of this decision could cause unnecessary hardship, if not immediately, then upon the moment the U.S. Specialty policy limit is met. If XL Specialty's motion were granted on ripeness ground, it would now be dismissed from this action. If further facts develop (for example, U.S. Specialty exhausts its policy limit) and the Side A Policy is then triggered, IDT (and/or Jonas) would have no choice but to reinitiate separate litigation against XL Specialty. The burden on a party to re-litigate issues is a well-recognized "obvious prejudice."[176]

Of course, the prospect of these duplicative efforts—the same parties, relying on identical facts, contesting the same issues with undifferentiated arguments—are contrary to the notion of judicial economy and the need to conserve the Court's scarce resources.[177] Granting declaratory relief now, however, promotes judicial economy and the efficient resolution of the issues in this action. By issuing this

---

[176] *Mine Safety Appliances*, 2014 WL 605753, at *5 (citing *Hoechst Celanese Corp.*, 623 A.2d at 1140).

[177] *Id.*

declaratory judgment, the Court is not imposing or creating immediate financial liability on XL Specialty.[178] Rather, a declaration by the Court simply affirms that the *Straight Path* Action triggers XL Specialty's coverage obligation under the Side A Policy. XL Specialty's duty to pay IDT is still subject to the Side A Policy's terms and conditions, *i.e.*, upon the exhaustion of the U.S. Specialty policy limits. So providing declaratory relief now does not unduly prejudice XL Specialty. Instead, it clarifies the parties' respective obligations and the triggering events for those obligations.

The other remaining factors—those that regarding possible future development of facts and due respect for relevant policies of law—also lean towards granting declaratory relief. Here, all the parties involved in the case have filed motions (or cross-motions) for summary judgment relying on the contested insurance policies' language and the factual allegations in the Underlying Complaint. Where all parties have filed for summary judgment, there appears no material factual dispute.[179] Each party here acknowledges that, without further

---

[178] *Bank of Delaware*, 448 A.2d at 235–36 (refusing to exercise discretion on declaratory judgment on issues relating to determination of financial liability under a federal environmental law).

[179] *Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 1992 WL 22690, at *5 (Del. Super. Ct. Jan. 16, 1992) (quoting *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del. 1988)), *aff'd sub nom, Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992).

discovery, the issues could be resolved at the summary judgment stage. Potential future development of "facts," if any, seems highly unlikely to pose a material or determinative change of the Court's resolutions of the legal issues herein.[180]

Granting declaratory relief here is consistent with respecting the "policies of the law touching upon the subject matter of the dispute."[181] The most pertinent policies of law in this motion concern the interpretation of insurance contracts. A declaratory judgment complies with the fundamental principles of, among others, according the contract terms their plain and ordinary meaning as the Court has found them.[182]

XL Specialty is wrong here, its coverage issue is ripe for adjudication. Accordingly, XL Specialty's motion for summary judgment is **DENIED**.

## V. CONCLUSION

For the reasons discussed above, IDT and Jonas's Motion for Partial Summary Judgment against U.S. Specialty is **GRANTED**, in part, and **DENIED**, in part. Defendant U.S. Specialty's Cross-Motion for Summary Judgment is **GRANTED**, in part, and **DENIED**, in part. Defendant National Union's Motion for Summary

---

[180] Again, a fact is only material if it might affect the outcome of the suit under governing law. *See* n. 55, *supra.*

[181] *Schick*, 533 A.2d at 1239.

[182] *Goggin,* 2018 WL 6266195, at *4; *Alta Berkeley VI C.V.*, 41 A.3d at 385.

Judgment is **GRANTED** with respect to its coverage obligation for IDT, and **DENIED** as to its obligation to defend Jonas. Defendant XL Specialty's Motion for Summary Judgment and Joinder is **DENIED**.

 **IT IS SO ORDERED.**

*/s/ Paul R. Wallace*
**Paul R. Wallace, Judge**
